## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOE SHIELDS, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:06-cv-01911-CKK |
| v. | ) ) | Judge Colleen Kollar-Kotelly |
| INPHONIC, INC., a Delaware Corporation, | ) ) | **Jury Trial Demanded** |
| Defendant. | ) | |

-------------------------------------------------------------x

### PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

For the past several years, as part of an effort to promote its clients' products, defendant InPhonic, Inc. ("InPhonic") made thousands of unsolicited text message telephone calls to the cellular phones of consumers throughout the country. In the industry, this practice is referred to as "text spamming." Plaintiff Joe Shields brings suit on behalf of a nationwide class, alleging that InPhonic's misconduct violates the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq (the "TCPA").

This is a textbook example of a case suitable for class certification. For all relevant purposes, the factual and legal issues are identical for each member of the class: Is text spamming under the purview of the TCPA? Did InPhonic use an automatic telephone dialing system to transmit this spam, as required by the Act? Are the class members entitled to statutory damages as a result of InPhonic's illegal conduct? To the extent that any individual issues remain after these are decided (and, as described below, it is unlikely that any could), they are *de minimis* in comparison to the common issues of this case.

The remaining prongs of the class certification test -- numerosity, typicality, adequacy of representation, and superiority -- are also easily satisfied. However, in the event that the Court

finds that certification is not appropriate at this time, Plaintiff requests that he be permitted time to conduct limited discovery and submit further evidence in support of the instant motion before a final determination is made.

## The TCPA

The TCPA was enacted in 1991 to "deal with various telemarketing practices arising out of the telemarketing industry's use of sophisticated equipment, generically known as autodialers, to generate millions of automated telephone calls to residential and business telephone subscribers." *See, Joffe v. Acacia Mortg. Corp.*, 211 Ariz. 325, 328  (Ariz. Ct. App. 2005), *cert. denied sub nom. Acacia Mortg. Corp. v. Joffe*, --- S. Ct. ----, No. 06-408, 2007 WL 36054 (Jan 08, 2007) (hereinafter "Joffe")  As explained in *Joffe*, "Congress found consumers and businesses were especially frustrated by these calls, viewing them as a nuisance, an invasion of privacy and a threat to interstate commerce." *Id.*  In order to combat this threat, the TCPA prohibits parties from making

> any call (other than a call made for emergency purposes or *made with the prior express consent of the called party*) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

47 U.S.C. 227(b)(1)(A)(iii) (emphasis added).

The Federal Communication Commission – which, under 47 U.S.C. § 227(b)(2), is required to "prescribe regulations to implement the requirements" of the TCPA – has made clear that the transmission of text messages falls within the purview of the TCPA.  *See, In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18

FCC Rcd 14014 , 14115,  165, 2003 WL 21517853 (2003) (TCPA prohibition on unsolicited calls "encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls provided the call is made to a telephone number assigned to such service").

The TCPA sets statutory damages in the amount of $500.00 per violation, with allowance for trebling.  *See* 47 U.S.C. 227(b)(1)(A)(iii).

### Facts

*1.    The Problem of Text Message Spam*

In recent years, in response to laws limiting commercial solicitation via telephone, facsimile and email, advertisers seeking the cheapest means available have increasingly looked to alternative technologies through which to send bulk solicitations.  Complaint ¶ 10.  One of the newest types of inexpensive bulk marketing uses technology known as Short Message Services ("SMS").  *Id.* ¶ 11.  SMS is a messaging system that allows the transmission of short text messages, usually limited to 160 or so characters, to and from cellular telephones.  *Id.*  An "SMS message" is a text message call directed to a wireless device through the use of the telephone number assigned that device.  *Id.* ¶ 12. When an SMS message call is successfully made, the recipient's cellular phone rings, alerting him or her that a call is being received.  *Id.*

Text spam is an especially pernicious form of advertising not only because the consumers are subjected to a violation of their right to privacy, but also because of the annoyance and aggravation that necessarily accompanies unsolicited wireless spam.  *Id.* ¶ 1-2.  In virtually all instances, the recipients actually have to *pay* their cell phone service providers for the receipt of such wireless spam (even though payment is not a prerequisite of a statutory violation) or request

-3-

that more such spam not be sent in the future, notwithstanding that it is sent in violation of specific legislation on the subject. *Id.* ¶ 2.

**2.      The Underlying Misconduct**

InPhonic is a self-described "leading provider of wireless services and mobile marketing applications." *Id.* ¶ 1. During the relevant time period, InPhonic owned and operated a text messaging system called Windcaster, which transmits text message advertisements to cellular telephones on behalf of InPhonic and its customers. *Id.* ¶ 13.

At or around 3:14 PM on March 28, 2005 – as with thousands of other cell phone users around the country – Plaintiff Joseph Shields's cell phone rang, indicating that he had received a text call. *Id.* ¶ 16. The sender of the transmission was designated in the message only by the cryptic term, "sync.windcaster." *Id.* ¶ 17. The body of the message read as follows:

> Cingular: Cheer on your favorite team during NCAA March
> Madness. Download your team's fight song or school logo. Std
> chrgs apply. To stop msgs send STOP to 3711.

*Id.* ¶ 15.

Although InPhonic claimed that it sent these text message on behalf of Cingular Wireless,  Cingular expressly disclaimed any part in the transmission and confirmed that the message was indeed text spam. *Id.* ¶ 18.

**3.      The Class**

Mr. Shields seeks to represent a class consisting of:

> All persons residing in the United States who, within four years
> prior to the filing of this lawsuit, (1) were sent a text message by
> Defendant and (2) did not provide advance express consent to be
> sent such text message by Defendant.

*4.*     *Procedural History*

Plaintiff filed his complaint on November 8, 2006.  After moving for and receiving an

unopposed extension to respond, InPhonic answered on January 9, 2007.  No discovery has been

conducted to date.

## ARGUMENT

**1.     Standards on the Motion**

To obtain class certification, it is not necessary for the plaintiff to establish that he will

prevail on the merits of the action.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)

("[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will

prevail on the merits, but rather whether the requirements of Rule 23 are met."); *accord, Kifafi v.*

*Hilton Hotel Retirement Plan*, 228 F.R.D. 382, 385 (D.D.C.  2005).  As a corollary, the courts

explain that "allegations in the complaint are presumed true for purposes of a motion for class

certification."  *See McReynolds v. Sodesho Marriott Services, Inc.*, 208 F.R.D. 428, 431 (D.D.C.

2002).   Further, doubts about the propriety of certification should be resolved in favor of

certification.  *See Aliotta v. Gruenberg,* 237 F.R.D. 4, 10 (D.D.C. 2006) ("[W]hen a court is in

doubt as to whether to certify a class action, it should err in favor of allowing a class.") (internal

quotation marks and citation omitted).

Under Rule 23(a),  a proposed class must satisfy four conditions before a court will grant

certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.

*See Kifafi v. Hilton Hotel Retirement Plan*, 189 F.R.D. 174, 175-76 (D.D.C.  1999).

Additionally, a putative class plaintiff must also satisfy at least one of the conditions in Rule

23(b).  *Id.* at 176.   In the instant case, a class should be certified pursuant to Rule 23(b)(3).

2.    **The Plaintiff's class satisfies all of the
      prerequisites for certification under Rule 23(a).**

A.    **The putative class is sufficiently numerous.**

Fed. R. Civ. P 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable," and, "[a]lthough there is no magic number of plaintiffs that will qualify for class certification, courts have generally found groups of more than fifty to satisfy the numerosity requirement." *In re Vitamins Antitrust Litigation*, No. MISC. 99-197, 2001 WL 856292, at *2 (D.D.C.,2001); *see also, Jarvaise v. Rand Corp.,* 212 F.R.D. 1, 2 (D.D.C. Feb 19, 2002) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."). Further, plaintiffs are not required to provide a "precise number" of the size of the class, so long as they have a basis to make a reasonable estimate. *See In re Lorazepam & Clorazepate Antitrust Litigation* 202 F.R.D. 12, 26 (D.D.C.,2001).

Here, even without the benefit of any discovery, it is clear that the instant class is in the thousands. Specifically, in 2003, InPhonic purchased a company, Avesair Inc., one of the chief assets of which was its text-message-delivery engine, Windcaster. In 2002, Windcaster delivered 56 million advertisement text messages. At the time it acquired Windcaster, InPhonic announced that it intended to continue serving Avesair's client base as well as other companies desiring to conduct text message ad campaigns. As of 2005, Windcaster remained under the control of InPhonic. See Group Exhibit A hereto. Because InPhonic delivers text message advertisements systematically and in massive quantities, a failure to secure consent from any of

the recipients must reasonably give rise to the inference that at least hundreds or thousands of other recipients have been similarly subjected to the unsolicited text messages.

Not surprisingly, InPhonic has not challenged the Court's jurisdiction pursuant to the Class Action Fairness Act, which requires that the amount in controversy be a minimum of $5,000,000. In this case, that is tantamount to a concession that there are at least 10,000 members (at the statutory damage amount of $500 each) in the putative class. Numerosity is satisfied.

**B.      Common questions of law or fact exist.**

Under Rule 23(a)(2) there must be at least one common question of law or fact. *See Kifafi*, 189 F.R.D. at 176-77. As discussed more fully in the section on predominance, below, the instant case presents many such common questions, including:

* Are text message transmissions under the purview of the TCPA?

* Did InPhonic use an automatic telephone dialing system when it transmitted these calls?

* Are the class members entitled to statutory damages as a result of InPhonic's misconduct?

* Are the class members entitled to injunctive relief?

These common issues easily satisfy the commonality requirement. *Kifafi*, 189 F.R.D. at 176-77 ("The commonality test is met where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.") (quotation marks and citation omitted).

**C.      Plaintiff's claims are typical.**

The typicality requirement under Rule 23(a)(3), "is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented." *Id*. at 177.   As with commonality, "factual variations between the claims of class representatives and the claims of other class members do not negate typicality." *Bynum v. District of Columbia*,  214 F.R.D. 27, 47 (D.D.C. 2003).   Here, there can be no question that Plaintiff's claims are typical; indeed, he has been subject to precisely the same practice as have the members of his class.   As such, his interests are "properly aligned and [his] claim is a suitable vehicle for resolution of the common questions of law." *Kifafi*, 189 F.R.D. at 177.

**D.     Plaintiff and class counsel will adequately represent the class.**

Rule 23(a)(4) requires that the named plaintiff "fairly and adequately protect the interests of the class."   That rule comprises two separate requirements.   First, there cannot be "any conflict of interest between the class representative and the absentee members of the class"and, second, plaintiff's counsel must be qualified to prosecute the proposed class action.   *Id.*   Both prongs are easily satisfied here.

In the instant case, Plaintiff's interests are not antagonistic, but rather are fully congruent with, the interests of other class members.   Similarly, Plaintiff's attorneys have broad experience in class litigation and other complex litigation (including being found to be suitable class counsel in a nearly identical "text spam" case brought under the TCPA.   *See* Exhibits B, C, and D hereto (Affidavits/Resumes of Stephen Ring, John G. Jacobs, and Jay Edelson).

**3.     Plaintiff satisfies the requirements of Rule 23(b).**

In addition to satisfying the requirements of Rule 23(a), a class representative must also satisfy at least one of the conditions in 23(b).  *See  Kifafi*, 189 F.R.D. at 176.  Here, Mr. Shields satisfies Rule 23(b)(3).

For a class to be certified under Rule 23(b)(3), common issues of law or fact must predominate over any individual issues.  Additionally, the Court must find that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### A.    Common issues predominate

This Court has noted that "[t]here is no definitive test for determining whether common issues predominate; however, in general, predominance is met 'when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position.'"  *In re Vitamins Antitrust Litigation*, 209 F.R.D. 251, 263 (D.D.C. 2002).  And although the common issues must predominate over individualized ones, the common issues "need not be dispositive" of the entire litigation, because class actions are appropriately certified even when they will necessarily leave some individual issues to be resolved subsequent to the class ones.  *Aliotta v. Gruenberg*, 237 F.R.D. 4, 12 (D.D.C. 2006).  Indeed, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though important matters will have to be tried separately."  *Id.* (internal quotation marks and citations omitted).

In the most concrete terms possible, all that Rule 23(b)(3) requires is that the resolution of the common issues will significantly move all of the claims forward.  The common issues presented by the instant case patently satisfy this requirement.  Here, numerous issues are

common to the class, and predominate over questions affecting individual class members, including: (1) whether text message transmissions are under the purview of the TCPA, (2) whether InPhonic used an automatic telephone dialing system when it transmitted these calls, and (3) whether the class members are entitled to statutory damages as a result of InPhonic's misconduct.

All of these common issues constitute significant parts of the litigation and predominate over any individual issues, if any, that may remain.

**B.      This class action is an appropriate method for the adjudication of the controversy.**

Finally, under Rule 23(b)(3), Plaintiff must demonstrate that the class action vehicle is superior to other available methods of adjudicating this controversy:

> Rule 23(b)(3) includes a nonexclusive list of relevant factors to consider: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3).

*Jarvaise v. Rand Corporation*, 212 F.R.D. 1, 4 (D.D.C.2002).  Here, because of the costs associated with bringing this case, few if any class members could pursue their rights individually – and to Plaintiff's knowledge there is no related litigation by any class member. And, because Defendant resides in Washington D.C., adjudicating the class claims is especially appropriate in this forum.  Finally, there are no potential difficulties in managing a class action here.

**4.      Alternatively, the Court should allow discovery.**

-10-

Under local rule 23.1, the Court has the option – in addition to either granting or denying the motion – to postpone ruling on a motion to certify a class until after relevant discovery has been completed.  In the event that this Court finds that any facts necessary for certification are lacking, Plaintiff requests that he be granted leave to conduct discovery to meet that need.[1]

**CONCLUSION**

As the foregoing discussion demonstrates, the instant case satisfies all of the requirements of Rule 23.  Therefore, Plaintiff Joe Shields respectfully requests that the Court enter an order certifying the class as defined above pursuant to Rule 23(b)(3).

---

[1]  Due to a lack of discovery in this litigation, a determination as to the matters set forth in Local Rule 23.1(c) with regard to provisions as to notice cannot be made at this time.  Plaintiff proposes that such determination be made after plaintiff is given limited discovery on the issues.

Respectfully submitted,

Joe Shields, individually and on behalf of a
class of similarly situated individuals


_____/s/_____
Stephen H. Ring


John Blim                              John G. Jacobs
Jay Edelson                            Bryan G. Kolton
Myles McGuire (Of Counsel)             The Jacobs Law Firm, Chtd.
Blim & Edelson, LLC                    122 South Michigan Avenue
53 West Jackson Boulevard              Suite 1850
Suite 1642                             Chicago, Illinois 60603
Chicago, Illinois 60604                Telephone: (312) 427-4000
Telephone: (312) 913-9400              Telefax: (312) 427-1850
Telefax: (312) 913-9401

Stephen H. Ring
Law Offices of Stephen H. Ring, P.C.
OBA Bank Building
Suite 200
20300 Seneca Meadows Parkway
Germantown, Maryland 20876
Telephone: (301) 540-8180
Telefax: (301) 540-8195



InPhonic                About Us | Services | |        Carrier Relations | News | Investor Relations | Contact Us
                                                                    Press Releases   Press Release Archives
                                                                        |



Back to Press Releases

## InPhonic Acquires Avesair to Strengthen Leadership Position in Wireless Services Market

*-- Avesair Brings Mobile Marketing Expertise, Marquee Customers and Investor Relationships to Wireless Communications and Services Company --*

**Washington, DC, May 19, 2003** - InPhonic Inc. today announced that it has completed its acquisition of Avesair Inc., a leading mobile marketing and media services company based in Research Triangle Park, NC. The acquisition will strengthen InPhonic's position in the wireless market by adding innovative SMS and MMS mobile marketing technology to its wireless services portfolio and will allow InPhonic to leverage Avesair's marquee customers and investor relationships.

Avesair established itself as a leader in mobile marketing technology by delivering 56 million targeted messages to mobile subscribers in 2002. The company's flagship WindCaster™ platform enables leading wireless providers, media firms, and consumer product companies to create, target, and deliver opt-in advertising, surveys, and entertainment campaigns to cell phones, PDAs, and other mobile devices. The company provides its technology and services to customers around the world including AT&T, MSN, Nokia, USA Today, Comedy Central, Mercedes-Benz and others.

"Wireless communications is growing in scope each day. We continue to evolve our business by adding new capabilities that unlock untapped market opportunities," said David Steinberg, CEO of InPhonic. "Through the acquisition of Avesair, the WindCaster platform enables InPhonic, its partners, and its channels to effectively harness direct-to-consumer mobile communications to establish a dialog between brands and consumers – creating new revenue opportunities, improving customer retention, and building brand awareness."

Avesair also brings investor relationships from Nokia Venture Partners, Intersouth Partners, and New Things, LLP. Financial terms of the deal were not disclosed.

**About InPhonic**

Headquartered in Washington, D.C., InPhonic Inc. (www.inphonic.com) is a leading provider of wireless voice and data communication solutions to enterprises, online businesses, national retailers and their end-users, offering an integrated platform for distributing and managing wireless communication devices and services. The company provides nationwide coverage through major wireless carriers, and it distributes wireless devices from some of the world's leading equipment manufacturers.

### # # #

© 2005 InPhonic Inc.
All rights reserved.
Privacy Statement



www.instantmessagingplanet.com/wireless/article.php/2209231

Back to Article

**InPhonic Looks to Build Mobile
Messaging Business**
By Christopher Saunders
May 19, 2003

Wireless messaging player InPhonic
is aiming to become one of the
major players in mobile marketing.

The D.C.-based firm on Monday
said it would acquire Research
Triangle Park, N.C.-based mobile
marketing startup Avesair, which
specializes in serving wireless ads
-- such as Short Messaging Service
and emerging Multimedia
Messaging Service.

Financial terms of the deal were not disclosed. InPhonic is banking that the
acquisition will strengthen its position in the wireless messaging space by enabling
it to offer an outsourced mobile ad creation and delivery engine.

That engine, Avesair WindCaster, is used by wireless carriers and marketers to
create, target, and deliver ads and surveys to cell phones, PDAs, and other mobile
devices. So far, clients including AT&T, MSN, Nokia, USA Today, Comedy Central
and Mercedes-Benz have used Avesair's ad server.

"We have focused pretty heavily in the last year or two in creating truly interactive
wireless content services, data service and wireless services, to which we are
adding the ability to do outbound targeted campaigns," said Karl Schlatzer, vice
president and general manager of interactive services at InPhonic. "Prior to Avesair
joining the InPhonic family, we were much better at response/reply-type of
applications, where a consumer initiated the interaction and we responded or
replied. Avesair allows us to add a proactive component to the mix."

"What we have been missing is way to allow a large number of personal and
brands to participate in the administration and distribution of campaigns," he
added. "We typically did everything in-house."

Now, the firm has access to an experienced, outsourced ad serving engine. During
2002, Avesair delivered more than 56 million targeted ads to mobile users on
behalf of advertisers. Early this year, the firm ran a ten-day mobile messaging
campaign for Comedy Central's new "Chapelle's Show." The effort garnered a
click-through rate of about 4.2 percent -- making it several times more effective
than typical results from online ad or direct mail campaigns.

In spite of such successes, interest in mobile marketing has thus far remained
limited, a fact that prompted three-year-old Avesair earlier this year to reduce
staff. Additionally, its use of WindCaster as its chief platform actually came about
as the result of the February, 2002 purchase of troubled mobile ad firm WindWire.
(Avesair, which launched in late 2000 as a spin-off of online ad player Engage,

originally started out using a modified version of that firm's advertising server.)

Still, InPhonic -- which chiefly resells wireless network connectivity and devices with value-added services, like messaging applications -- said it remains optimistic about the market opportunity for wireless services.

"Wireless communications is growing in scope each day," said InPhonic Chief Executive David Steinberg. "We continue to evolve our business by adding new capabilities that unlock untapped market opportunities ... The WindCaster platform enables InPhonic, its partners, and its channels to effectively harness direct-to-consumer mobile communications to establish a dialog between brands and consumers -- creating new revenue opportunities, improving customer retention, and building brand awareness."

InPhonic said it plans to continue serving Avesair's customers, and also has hopes of leveraging the company's relationships with investors, which include Nokia Venture Partners, Intersouth Partners, and New Things, LLP.

The acquisition is the latest move by InPhonic to position itself as a player in the mobile ad space, coming as it does on the heels of a deal with radio station giant Clear Channel Communications. Through that effort, InPhonic will deliver SMS messages to listeners of six Clear Channel stations in Cleveland.

The move also comes as players in the wireless messaging sector are refining their offerings in advance of what's expected to be increasing interest in the medium from enterprise customers and marketers. A number of wireless carriers, for instance, have been busily striking high-profile agreements with popular television programs to encourage consumers to use SMS.

Carriers like AT&T Wireless (Quote, Chart) also have been working to beef up their enterprise wireless messaging offerings.

Thus far, however, corporate interest in wireless messaging for communications or advertising has been relatively scant, especially in the U.S. In addition to cash-strapped businesses reluctance to invest in untried enterprise technology or marketing media, that lack of interest has also been due to U.S. consumers' unfamiliarity with SMS. Instead, companies' wireless spending has typically revolved around mobilizing applications like e-mail or inventory applications.

*Christopher Saunders is managing editor of InstantMessagingPlanet.com.*

JupiterWeb networks:

internet.com | EARTHWEB | | ClickZ | graphics.com

Search JupiterWeb: | Find |

Jupitermedia Corporation has four divisions:
JupiterWeb, JupiterResearch, JupiterEvents and JupiterImages

Copyright 2005 Jupitermedia Corporation All Rights Reserved.
Legal Notices, Licensing, Reprints, & Permissions, Privacy Policy.

Jupitermedia Corporate Info | Newsletters | Tech Jobs | E-mail Offers

## <u>AFFIDAVIT OF STEPHEN H. RING</u>
## <u>REGARDING QUALIFICATIONS AS CLASS COUNSEL</u>

I , Stephen H. Ring, hereby depose and state the following under oath:

I am an attorney admitted to practice in Maryland and the District of Columbia, in good standing in both jurisdicitons.  Based on my personal knowledge, I affirm that the information stated below is accurate and true:

1.    **I have received the following relevant formal education:**
    B.A., Dartmouth College, 1974
    J. D., Boston University School of Law, 1977

2.    **I have the following relevant litigation experience:**
    Law clerk, Galiher, Martell and Donnelly, Washington, D.C. 1975-76
    Law clerk, Honorable Richard B. Latham, Circuit Court for Montgomery, Maryland, 1977-78
    Associate, Brault, Graham, Scott and Brault, Rockville, Maryland 1978-87, civil litigation;
    Stephen H. Ring, P.C., from 1987 to present, concentration in civil litigation; Numerous complex suits as first chair.
    Admitted to practice in Maryland and the District of Columbia, in all federal and state courts of general jurisdiction.

3.    **I have the following civil litigation experience:**
    Dozens of jury and non-jury trials involving tort and commercial law and appearances in the U.S. District Court for the District of Maryland, U. S. District Court for the District of Columbia, U.S. Court of Appeals for the Fourth Circuit; and the Maryland state courts including District, Circuit, Court of Special Appeals and Court of Appeals.  Pro haec appearances in state courts in Virginia, West Virginia, California.  Experienced in all phases of discovery, trial, post-trial, and appeals. First-chaired, and in most instances served as solo counsel, in cases involving dozens of lengthy depositions taken in various states around the country.

4.    **I have the following class action experience:**

<u>Mathewson, et al. v. Utilicorp</u>, Circuit Court for Montgomery County, Maryland Case No.168971-V.  Co-counsel for plaintiff class in suit by consumers against reseller of natural gas for failure to provide promised discounts and consolidated billing. Class was certified.  Settled in 1997.

<u>Lloyd, et al. v. General Motors, et al.</u>, Circuit Court for Montgomery County, Maryland, Case No. 200484.  Class action by vehicle owners over defectively designed seat backrests.  Co-counsel of record for Plaintiffs.  Pending.

In re Swanson Creek Oil Spill Litigation, United States District Court for Maryland, Southern Division, PJM-00-1429.  Class action by property owners and others arising from oil pipeline leak.  Co-counsel of record for plaintiffs.  Took most of the depositions of defense witnesses on class issues and merits.  Class was certified.  Settled in 2002.

R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc., et al.  Circuit Court for Montgomery County, Maryland, Case No. 215514; Class action for violations of Telephone Consumer Protection Act.  Private cause of action under TCPA in Maryland state courts, recognized.  R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc., 382 Md. 689, 857 A.2d 1 (2004); 2004 Md. LEXIS 503; 2004 TCPA Rep. 1303 (Md. App. Aug. 26, 2004).  Settled.

Levitt v. Fax.com, Inc. et al., Circuit Court for Baltimore City, Case No. 24-C-01-2218.  Class action under Telephone Consumer Protection Act.  Co-lead counsel.  Class was certified.  Pending.

Marine Technologies v. DirecTV, et al., Case  No. 01-635, Circuit Court for St. Mary's County, Maryland, Case No. 225273.  Class action under Telephone Consumer Protection Act.  Co-lead counsel.  Class was certified; settled.

Nixon v. Loyd, et al. , Circuit Court for Montgomery County, Maryland, Case No. 216130 . Class action for violations of TCPA.  Settled.

RSCM, Inc. t/a Parco v. International FiberCom, Inc., et al., Circuit Court for Prince George's County, Maryland, CAL 00-26927.  Class action under Telephone Consumer Protection Act.  Pending.

PALCUS v. Investors' Alert et al., Superior Court for the District of Columbia, Case No. 01-3479.  Class action under TCPA. Pending.

Kogok v. Perry Johnson, Inc., Case No.  DKC 06 CV0862 U.S. District Court, Maryland, Southern Division.  Pending.

I declare and affirm under the penalties of perjury that the foregoing statements and information are true and correct.

February 6, 2007                              /s/                              
Stephen H. Ring

## THE JACOBS LAW FIRM, CHTD.

The Jacobs Law Firm, Chtd. specializes in complex civil litigation with a special emphasis on plaintiffs' class actions, including those involving consumer fraud issues, securities fraud, and ERISA.  The Jacobs Law Firm, Chtd. was founded by John G. Jacobs in November of 2000.  For 25 years prior thereto, Mr. Jacobs was associated with the firm of Plotkin, Jacobs & Orlofsky, Ltd. ("PJ&O")  and its predecessors as a principal and managing partner.

The firm (and prior thereto, the Plotkin, Jacobs & Orlofsky firm) has a national practice, engaged in significant litigation across the country representing plaintiffs almost exclusively in matters including securities law, ERISA, RICO, antitrust, consumer fraud, and insurance-related issues.  In *McLendon v. Continental Group, Inc.*, Judge H. Lee Sarokin wrote about PJ&O's efforts in that case, where the firm was lead counsel, that counsel "performed in a heroic, superb, and extraordinary manner."  *McLendon v. Continental Group, Inc.*, 872 F. Supp. 142, 165 (D.N.J. 1994).  "No one," Judge Sarokin wrote, "could review the record in this case and help but conclude that the risks were monumental, the dedication and sacrifice of counsel heroic, the quality of performance superb, and the result extraordinary."  Id. at 146.

In the last few years, The Jacobs Law Firm or the PJ&O firm have either been lead counsel or shared a significant lead role in the following cases, among others:

1.  *Daniel v. Aon,* Case No. 99 CH 11893, Cook County Circuit Court (Judge Nowicki) ($87 million cash settlement plus injunctive relief regarding business practices of major insurance brokerage firm in receiving undisclosed "contingent commissions."  Appeal pending.)

2.  *Shen v. Distributive Networks,* 06 C 4403, (Settlement preliminarily approved providing cell phone customers $150 payments for alleged violations of the Telephone Consumer Protection Act with regard to receipt of text message solicitations.)(Judge Filip)

3.  *Brannan v. Health Care Service Corp.,* Case No.  00C 6884, Northern District of Illinois (Magistrate Judge Brown) ($6.95 million cash settlement plus injunctive relief against insurer for its practices in collecting so-called "reimbursement liens" from insureds' tort recoveries).

4.    *Ramlow v. Family Health Plan*, Case No. 00 CV 00386, Milwaukee County Circuit Court. Obtained injunction, affirmed by appellate court, against termination of class's health insurance and obtained continued coverage for the class by successor firm.

5.    *Holloway v. J.C. Penney Life Insurance Co.,* Case No. 97 C 4555 (N.D. Ill.) Obtained ruling from 7th Circuit (190 F.3d 838, 7th Cir. 1999) as to illegality of company's intoxication exclusion clause, and obtained full or partial payments of death benefits for class of denied beneficiaries.

6.    *McLendon v. Continental Group, Inc.*, 602 F.Supp. 1492 (D.N.J. 1985); 749 F.Supp. 582 (D.N.J. 1989), *aff'd* 908 F.2d 1171 (3rd Cir. 1990); 802 F.Supp. 1216 (D.N.J. 1992) ($415 million cash settlement of nationwide class action for employer's ERISA violations in preventing employees from vesting for benefits at plants across the country).  (Judge Sarokin)

7.    *Martin v. Heinold Commodities, Inc.*, No. 80 CH 6439, 163 Ill.2d 33 (1994), 240 Ill.App.3d 536 (1992), 117 Ill.2d 67 (1987), 139 Ill.App.3d 1049 (1985).  (Breach of fiduciary duty and Illinois Consumer Fraud Act class action.  $3.5 million cash settlement in 1995 after a trial on liability and damages.) (Judge Green)

8.    *Bennett v. Berg,* Case No. 80-0381-CV-W-O consolidated with No. 80-0459-CV-W-O, U.S. District Court for the Western District of Missouri; 710 F.2d 1361 (8th Cir. En Banc 1983).  (Settlement on behalf of 400-plus elderly residents of a "life care" village resulting in payment of $14-plus million plus cancellation of $48 million mortgage.)  (Judge Roberts)

9.    *Pickering v. USX Corporation*, 809 F.Supp. 1501 (D. Utah 1992)  ($42 million cash settlement of an ERISA action on behalf of approximately 2,000 steelworkers laid off in order to prevent their attaining pension benefits after a trial on liability and a second trial on damages).  (Judge Jenkins)

10.   *Carrao v. Health Care Service Corp.*, 118 Ill.App.3d 477, N.E.2d 417 (1st Dist. 1983).  (Affirming class certification and decision by trial court that Blue Cross/Blue Shield may not refuse to pay insureds' medical bills because it believes the underlying medical services were "not medically necessary.")  (Judge Green)

11.   *Cosentino v. State Farm Mutual Automobile Insurance Company*, 83 CH 0378, Cook County Circuit Court.  (Obtained retroactive underinsured and uninsured motorist insurance for a class of approximately 1.2 million insureds.)  (Judge Wosik)

12.   *O'Neill v. Allstate Insurance Company*, 83 CH 535, Cook County Circuit Court.  ($5 million settlement fund for the payment of retroactive underinsured and uninsured motorists' losses.)  (Judge Green)

13.   *Kaszuk v. Bakery and Confectionery Union*, 638 F.Supp. 365 (N.D. Ill. 1984); aff'd, 791 F.2d 548 (7th Cir. 1986).  (Obtained declaration of ERISA violations and injunction requiring pension fund to give notice of such rulings to widows with potential entitlement to some $10 million in back payments plus future payments for life.)  (Chief Judge Grady)

14.    *Hedberg v. Schanck,* 83 C 2993, U.S. District Court, N.D. Ill. ($11 million -- exclusive of attorneys' fees and costs -- class action settlement in going-private leveraged buyout transaction.) [1985 Tr. Binder] Fed.Sec.L.Rep. (CCH) par.92,384 (Judge Moran)

15.    *Mayer v. Northwest Industries*, 82 C 658, U.S. District Court, N.D. Ill. (Obtained $18 million jury verdict for securities fraud and breach of fiduciary duty after three-week jury trial on behalf of class of stockholders. Settled on appeal for $10 million.) (Judge McGarr)

16.    *King v. Blum,* 84 C 10917, 85 C 4261, 85 C 5384, U.S. District Court, N.D. Ill. ($3.9 million settlement in securities fraud class action.) (Judge Leinenweber)

17.    *Hickerson v. Velsicol Chemical Corporation,* No. 81 C 2543 (N.D. Ill.) 778 F.2d 365 (7th Cir. 1985). (ERISA class action. $2.5 million cash settlement, exclusive of fees and expenses, for conversion of profit sharing plan to pension plan.) (Judge Hart)

18.    *Goldberg v. Sweet*, 117 Ill.2d 493, 512 N.E.2d 1262 (1987); 488 U.S. 252, 109 S.Ct. 582 (1989). (Class action challenging the Illinois tax on interstate telephone communications that eventually reached the United States Supreme Court on important Commerce Clause issues.)

19.    *In re Jackpot Enterprises, Inc. Securities Litigation*, No. CV-S-89-805 U.S. District Court, Nevada. ($3.25 million settlement of fraud-on-the-market Rule 10b-5 class action.) (Judge George)

20.    *Picardi v. Chicago Truck Drivers Union*, No. 83 C 343 U. S. District Court, N.D. Ill. (ERISA class action. Obtained $3.75 million cash recovery plus structural relief mandating installation of new computer system and reduction of administrative personnel resulting in annual savings of approximately $1 million.) (Judge Alesia)

The firm currently is involved in various class actions and cases brought as class actions in state and federal courts in Illinois, California, Wisconsin, Michigan, and Massachusetts, as well as substantial non-class litigation in Arkansas.

The Jacobs Law Firm, Chtd. consists of John G. Jacobs and associate Bryan G. Kolton. Mr. Jacobs is a 1972 graduate of the University of Chicago Law School, where he was the winner of the 1972 Hinton Moot Court Competition  (Justice Rehnquist, Justice Stevens and Judge Elbert Tuttle).  Following service in the U.S. Navy JAG Corps, he  has been engaged in complex civil litigation for the last 32 years, first with PJ&O and then with The Jacobs Law Firm.  Bryan

G. Kolton is a 1999 graduate of Loyola University Chicago School Of Law, where he served on the Law Journal.  He has been associated with The Jacobs Law Firm since September of 2001.

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOE SHIELDS, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | No.  1:06-cv-01911-CKK |
| v. | ) ) | Judge Colleen Kollar-Kotelly |
| INPHONIC, INC., a Delaware Corporation, | ) ) | **Jury Trial Demanded** |
| Defendant. | ) | |

-------------------------------------------------------------x

**Affidavit of Jay Edelson**

I, Jay Edelson, based on personal knowledge, swear as follows:

***Firm Background***

1.      Since its inception in 2001, Blim & Edelson, LLC ("Blim & Edelson") has concentrated its practice on complex civil litigation and plaintiffs'-side class actions.  The firm comprises two members, John Blim and me.  Additionally, Myles McGuire is Of Counsel to the firm.

2.      The firm's members have been certified as class counsel, *inter alia,* in the following cases:

      \*      Shen v. Distributive Networks LLC. No. 06 C 4403 (N.D.Ill.)

Court has preliminarily approved settlement alleging that defendant violated TCPA by sending unsolicited text messages to the cellular telephones of consumers throughout the country. The settlement provides each class member with up to $150 in cash.

       *      *Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cook County, Ill.) Blim & Edelson is co-lead counsel in group of cases brought against two health clubs and a number of debt collectors. The court has preliminarily approved a global settlement to resolve these cases, which will provide the class with over $40 million face value in benefits, consisting of cash payments, debt relief, and free health club services.

       *      *Kozubik v. Capital Fitness, Inc.,* 04 CH 627 (Cook County, Ill.): Blim & Edelson was lead counsel in a suit against a leading health club chain that settled in 2004. The settlement provided the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

       *      *Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cook County, Illinois): Blim & Edelson, LLC was certified as sole class counsel in a state-wide class action suit brought under the state's consumer dating protection laws. The settlement provided the nearly 65,000 with a collective award with a face value in excess of $3,000,000.

       *      *Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cook County, Illinois): Blim &

Edelson, LLC was certified as sole class counsel in a state-wide class action suit brought under the state's consumer dating protection laws.  The settlement provided the class members with a collective award with a face value of between $1.6 million and $4.8 million.

      *      *Cioe v. Lycos,* No. 02 CH 21456 (Cook County, Illinois):  Blim & Edelson, LLC was certified as sole class counsel in a state-wide class action suit brought under the state's consumer dating protection laws.  The settlement provided the class with a collective award with a face value of between $280,000 and $840,000.

      *      *Gavrilovic v. Vintacom Media Group, Inc.,* No. 04 CH 11342 (Cook County, Illinois):  Blim & Edelson, LLC was certified as sole class counsel in a class action suit brought under the state's consumer dating protection laws.  The case settled on a class-wide basis in 2005 providing the class with a collective award with a face value between $284,000 and $852,000.

      *      *Zurakov v. Register.com*, No. 01-600703 (N.Y.Cty, New York): Blim & Edelson was lead counsel representing a class of over one million members (world-wide) in a suit against Register.com for its deceptive practices in registering internet domain names.   In November, 2003, the New York Supreme Court (trial division) granted final approval of a settlement that required Register.com to fully disclose its practices and provided the class with a relief with a collective face value in excess of $17 million.

      *      *McArthur v. Spring Street Networks*, 100766/2004 (NY Cty.) (Blim &

Edelson was lead counsel in a suit brought under NY GBL § 349, company violated New York law regulating dating companies. In 2006, the New York Supreme Court (trial division) gave final approval to the settlement, which provided the class with relief with a collective face value of over $1,000,000.)

\* *Holloway v. J.C. Penney*, No. 97 C 4555, (N.D.Ill.): I was one of the primary lawyers in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to plaintiffs' class. The case settled in or around December of 2000, resulting in a multi-million dollar cash award to the class.

\* *Ramlow v. Family Health Plan* (Wisc.Cir.Ct.): I was one of two attorneys primarily responsible for a suit challenging the defendant's termination of health insurance to a class of individuals. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually settled the case ensuring that each class member would remain insured.

3. The firm currently is lead or co-lead counsel in numerous putative class action cases, brought in California, Illinois, New York, Washington D.C., and Pennsylvania.

4. Our experience includes litigating approximately over a half-dozen suits involving improper charges to cellular telephones or unsolicited text message spam.

5. John Blim is a graduate of Northwestern University School of Law, where he received his J.D. degree *cum laude* in 1994. He is a member of the Order of the Coif by virtue of having graduated in the top 10% of his law school class. He served as an articles editor on the

*Northwestern University Law Review* from 1993 to 1994. Mr. Blim was also a member of the winning team and voted Best Speaker in the law school's moot court competition. From 1994-2000, he was a litigation associate at nationally recognized law firms, including Sidley & Austin. In April 2000 he started his own private practice in Chicago, focusing on civil litigation and complex plaintiff's class actions. In July 2001, Jay Edelson joined Mr. Blim to create Blim & Edelson, LLC.

6.      I am a 1996 graduate of the University of Michigan Law School. From 1997-2000, I was a litigation associate focusing on class action and other complex litigation, working first for large defense firms (Holleb & Coff and Grippo & Elden) and then a prominent plaintiff's class action firm. In July 2001, I became a founding member of Blim & Edelson.


7.      Myles McGuire graduated from Marquette University Law School in 2000. He joined the firm in 2004, after spending several years counseling high-tech companies. His practice concentrates, nearly exclusively, on consumer protection law and class actions. He is admitted to practice in Wisconsin and Illinois.

DATED: February 6, 2007


/s/ Jay Edelson
Jay Edelson

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

JOE SHIELDS, individually and on ⟩
behalf of a class of similarly situated individuals, ⟩
⟩
               Plaintiff, ⟩    No.  1:06-cv-01911-CKK
⟩
             v. ⟩    Judge Colleen Kollar-Kotelly
⟩
INPHONIC, INC., a Delaware Corporation, ⟩    **Jury Trial Demanded**
⟩
            Defendant. ⟩
-------------------------------------------------------------x

## ORDER GRANTING CLASS CERTIFICATION

This matter comes to the Court on the plaintiff's Motion for Class Certification,

IT IS HEREBY ORDERED that:

1.      Plaintiff's motion is granted.

2.      The Court hereby certifies a class (the "Class") of individuals as defined as follows:

> All persons residing in the United States who, within four years
> prior to the filing of this lawsuit, (1) were sent a text message by
> Defendant and (2) did not provide advance express consent to be
> sent such text message by Defendant.

3.      The Court hereby designates Joe Shields as the representative of the Class.

4.      The Court hereby designates John Jacobs of The Jacobs Law Firm, Chtd.and  Jay

Edelson of Blim & Edelson, LLC along with John Blim and Myles McGuire of Blim & Edelson,

LLC, Bryan Kolton of The Jacobs Law Firm, Chtd., and Stephen H. Ring of Stephen H. Ring,

P.C., as Class Counsel.

5.     The Court hereby orders that the parties will engage in limited discovery to ascertain the best method of notice to be sent to the Class and that they will report back to the Court within 60 days of this order.

_____

United States District Court Judge